Filed 6/2/22  In re J.S. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.S., a Minor. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.W.S.,<br><br>    Objector and Appellant. | A164056<br><br>(San Francisco City and County Super. Ct. No. JD20-3104) |

J.W.S. (Father) appeals from the juvenile court's order terminating his parental rights with respect to J.S., his son. Father contends that the San Francisco Human Services Agency and the court failed to satisfy their inquiry and notice obligations under the federal Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (the Act)) and related California law.  Because Father's contention is correct, we conditionally reverse the order terminating parental rights and direct the juvenile court to ensure compliance with the Act's inquiry and notice requirements.

**BACKGROUND**

**A.**

The Act protects Native American children and promotes the stability and security of Native American tribes and families by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. § 1901 et seq.; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*).) When there is reason to believe a child in a dependency case is an "Indian child," the Act requires that the child's tribe be notified of the proceeding and its right to intervene. (25 U.S.C. § 1912(a); see also Welf. & Inst. Code, § 224.3, subd. (b).[1]) An "Indian child" is an unmarried person under age 18 who is a member of an Indian tribe or is eligible for membership and is the biological child of a member. (25 U.S.C. § 1903(4); see also *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1166 ("A child may qualify as an Indian child . . . even if neither of the child's parents is enrolled in the tribe.") The required notice facilitates a determination of whether the child is an Indian child and allows the tribe an opportunity to intervene. (*Isaiah W., supra*, at p. 8.) When an Indian child is involved, the Act imposes certain procedural protections, including heightened evidentiary requirements before parental rights may be terminated or a foster care placement may be ordered. (See 25 U.S.C. § 1912(b) - (f).) Our legislature has codified and supplemented the Act's requirements in state law. (See Welf. & Inst. Code, §§ 224.2, 224.3; *Isaiah W., supra*, at p. 9.)

**B.**

When J.S. was 10 months old, the Agency filed a juvenile dependency petition pursuant to section 300. The petition alleged that J.S. was at risk of harm because his parents, Father

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

and A.B. (Mother), had substance abuse problems, their relationship was abusive, and they could not adequately protect and care for him.

Shortly before the Agency filed the petition, Mother informed the social worker that she has Cherokee and Choctaw heritage. Mother stated that maternal grandmother, T.D., has Native American ancestry but she did not know if T.D. was an enrolled tribal member. Mother was not an enrolled tribal member. Mother's counsel also completed a "Parental Notification of Indian Status" form stating that Mother had "Blackfoot" ancestry through T.D., in addition to Cherokee and Choctaw heritage. The social worker was also in touch with J.S.'s paternal grandmother, who stated that Father does not have Native American ancestry.

Approximately a week after filing the petition, the Agency sent notices to the Cherokee Nation, Choctaw Nation of Oklahoma, Eastern Band of Cherokee Indians, Jena Band of Choctaw, Mississippi Band of Choctaw Indians, and United Keetoowah Band of Cherokee. The notices indicated that Mother was affiliated with the noticed tribes, as well as the "Blackfeet Tribe." The notices listed T.D. as J.S.'s maternal grandmother and indicated that she was affiliated with each of the noticed tribes. The notices provided a birth date and state for T.D., but provided no current or former address information for her. Other than providing some information about Father, the notices listed "[n]o information available" for all other relatives, including J.S.'s paternal grandmother, maternal or paternal grandfathers, and great grandparents.

Each of the noticed tribes responded, indicating that they were unable to establish J.S.'s Indian heritage or membership.[2]

---

[2] Although the record does not contain proof that the Agency sent notice to the Blackfeet Tribe, the record includes two

3

The juvenile court found that the Act's requirements had been satisfied and the Act does not apply to J.S.

Ultimately, the court terminated the parental rights of Father and Mother and selected adoption as the permanent plan for J.S.

## DISCUSSION

Father contends that the juvenile court's determination that the Act is inapplicable must be conditionally reversed because the Agency failed to conduct an adequate inquiry into the J.S.'s Indian heritage. We agree.

Section 224.2, subdivision (a) imposes on the court and the county welfare department "an affirmative and continuing duty to inquire whether a child" in a dependency proceeding "is or may be an Indian child." (See also § 224.2 subds. (b), (e), (j); *Isaiah W.*, *supra*, 1 Cal.5th at pp. 10-12.) When there is reason to believe that a dependency proceeding involves an Indian child, the court or social worker must inquire further into the child's potential Indian status, including by interviewing the parents and extended family members to gather the necessary information. (§ 224.2, subd. (e)(1); see also § 224.2, subd. (e)(2).) Section 224.3, subdivision (a)(5)(C) in turn mandates that the notice to a tribe include, if known, the names, current and former addresses, birth dates, places of birth and death, tribal enrollment information, and other identifying information of the child's biological parents, grandparents, and great-grandparents. Accordingly, the Department had an affirmative and continuing duty to interview all family members likely to have information about J.S.'s Native American ancestors. (See *In re N.G.* (2018) 27 Cal.App.5th 474, 482 (*N.G.*); *In re K.R.* (2018) 20 Cal.App.5th

letters from the Blackfeet Tribe indicating that they were unable to find J.S. on the tribal rolls.

4

701, 707 (*K.R.*); *In re A.G.* (2012) 204 Cal.App.4th 1390, 1396-1397 (*A.G.*).)  The juvenile court likewise "has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices . . . without doing so." (*K.R., supra,* at p. 709.)  We review independently whether, on the undisputed facts, the Agency and the court have satisfied the Act's requirements.  (See *Guardianship of D.W.* (2013) 221 Cal.App.4th 242, 250.)

Here, we accept the Agency's concession that it failed to conduct an adequate inquiry.  After Mother informed the social worker that maternal grandmother, T.D., had Native American ancestry, the social worker signed a form acknowledging that she had "reason to believe the child is or may be an[] Indian child." Accordingly, the Agency had a duty to inquire further into J.S.'s ancestry, including by contacting extended family members.  (§ 224.2, subd. (e)(2)(A).)  Yet, the record contains no indication that, after the initial conversation with Mother, the Agency made any effort to investigate her Native American ancestry.  There is no record that the Agency asked Mother for T.D.'s contact information or attempted to interview her.  Indeed, although Mother provided the social worker not only with the names of her parents but also her three brothers, the Agency did not document any attempts to contact anyone in her family other than her father.  The social worker spoke on the phone with Mother's father to obtain contact information for Mother at one point, but there is no record of the social worker asking him about J.S.'s Native American ancestry.  Neither does the record show that the Agency ever asked Father about J.S.'s ancestry or interviewed any of J.S.'s other extended family members other than J.S.'s paternal grandmother.

The notices were also incomplete.  They provided limited information concerning J.S.'s Native American ancestry, listing

5

T.D. as J.S.'s maternal grandmother.[3]  The Agency had T.D.'s middle name yet omitted it from the notices.  The Agency listed T.D.'s birthdate and state of birth but provided no address or other identifying information for her.  Similarly, the Agency failed to list information about any lineal ancestors other than J.S.'s parents and T.D., instead writing "[n]o information available" in every field.  The Agency failed even to include information about known family members.  Although the Agency was in touch with J.S.'s maternal grandfather and paternal grandmother, the notices omitted their names and instead stated "no information available" in the entries for both.  Likewise, even though Mother provided the Agency with the names of her brothers, the notice left the fields for information concerning J.S.'s uncles blank.  In addition, although the Agency obtained Father's current address, they never provided this information to the tribes.[4]

---

[3] The record contains a discrepancy concerning the name of J.S.'s maternal grandmother.  The Agency reported at one point that Mother stated that her mother's name was "Maggie." However, in discussing J.S.'s potential status as an Indian child, the Agency stated that the "maternal grandmother" was named T.D.; it is unclear whether the term "maternal grandmother" was used in reference to J.S. or Mother.  In the notices, the Agency listed T.D. in the space for J.S.'s maternal grandmother. Obviously, to the extent the notices provided incorrect information, such errors would further undermine the reliability of the tribes' determinations concerning Indian child status.

[4] The Agency appears to have sent the notices prior to learning Father's current address, establishing contact with J.S.'s paternal grandfather, or learning the names of his maternal uncles.  However, the Agency had a duty to conduct an adequate investigation prior to sending out the notices.  (§ 224.2, subds. (a) - (c), (e), (g); § 224.3, subds. (a)-(b).)  Further, in light of the Agency's *continuing* duty of inquiry, it also should have provided updated notices to the tribes that contained the subsequently obtained information.  (See, e.g., §§ 224.3, subd. (a)(5)(C)

The Agency's failure to fulfill its duty of inquiry, as well as the juvenile court's failure to ensure that it satisfied that duty, was error. (See *A.G.*, *supra*, 204 Cal.App.4th at p. 1397 [error where notices failed to provide known information regarding extended family and agency's reports failed to indicate any efforts to investigate child's Indian heritage].) It is only *after* the Agency has provided adequate notice to the tribes that the court is authorized to determine whether the Act applies. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 11; § 224.2, subd. (i)(2).)

The Agency does not contend that the deficiencies were harmless. Because both the inquiry and the notices were deficient, it is impossible to know whether an adequate investigation would have turned up information bearing on the tribes' determinations of whether J.S. is an Indian child. (See *N.G.*, *supra*, 27 Cal.App.5th at p. 485.) The affirmative duty to gather relevant information concerning Native American ancestors is critical to ensuring that the notice requirements are satisfied in a meaningful way; otherwise, very little of the required information would ever be "known." (§ 224.3, subd. (a)(5)(C); see, e.g., *In re Francisco W.* (2006) 139 Cal.App.4th 695, 703 (*Francisco W.*) ["It is essential to provide the Indian tribe with all available information about the child's ancestors, especially the ones with the alleged Indian heritage."].) For example, in its letter responding to the notice they received in this case, the United Keetoowah Band of Cherokee Indians emphasized that its determination that J.S. was not an Indian child "is based on the information that was exactly [as] provided by you. All incorrect or omitted family information could invalidate this determination." The letters from the Eastern

---

[requiring the notice to the tribes to include "known" names and addresses of the child's relatives]; 224.3, subd. (b) [notice is required for every hearing that may result in an order terminating parental rights, unless a determination that the Act does not apply is made "in accordance with section 224.2"].)

Band of Cherokee Indians, the Cherokee Nation, the Choctaw Nation of Oklahoma, and the Blackfeet Tribe contained similar qualifying language.

Finally, the parties agree that a remand for compliance with the Act is necessary, but they disagree as to whether we should conditionally reverse the order terminating parental rights, or conditionally affirm it. We see no reason in this case, and the Agency has suggested none, to depart from the established appellate practice of reversing the order terminating parental rights and remanding for the limited purpose of ensuring compliance with the Act. (See *Francisco W., supra*, 139 Cal.App.4th at pp. 705-708 [explaining that the prevalent practice of limited reversals in cases involving notice failures under the Act is consistent with principles of appellate practice as well as the best interests of the child]; see also, e.g., *In re A.R.* (2022) 77 Cal.App.5th 197, 208 [conditionally reversing judgment terminating parental rights and remanding with directions to comply with inquiry requirements of the Act]; *N.G., supra*, 27 Cal.App.5th at p. 486 [same]; *K.R., supra*, 20 Cal.App.5th at pp. 709-710 [same]; *A.G., supra,* 204 Cal.App.4th at p. 1402 [reversing with instructions for the juvenile court to order the agency to investigate and obtain information concerning relatives with Indian ancestry].) A limited remand preserves stability for the child pending further proceedings to investigate the child's status as an Indian child and ensure proper notice to the relevant tribes. (See *Francisco W., supra*, at p. 708.) Ultimately, if the child is not an Indian child, then the termination order is reinstated, with minimal disruption to the child. (See *id.* at pp. 708, 710-711.) At the same time, this approach ensures that, should the child be determined to be an Indian child, the case will proceed under the heightened protections of the Act, without the parents having to shoulder the burden of affirmatively moving to vacate the termination order. (Compare *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1395-1396 [declining to reverse

termination of parental rights, and providing that upon remand, should a tribe determine the minors are Indian children, the parents may petition to vacate the termination order].) Given the Agency's undisputed failure to comply with its legal obligations, reversal is the appropriate remedy. (See *In re B.R.* (2009) 176 Cal.App.4th 773, 785-786.)

## DISPOSITION

The order terminating parental rights is conditionally reversed. The juvenile court is directed to order the Agency to investigate J.S.'s potential Native American heritage, obtain complete and accurate information about his Native American ancestors, and provide proper notices to the relevant tribes. If a tribe intervenes after receiving proper notice, the court shall proceed in accordance with the Act. If no tribes intervene after receiving proper notice, the order terminating parental rights shall be reinstated.

_____
BURNS, J.

We concur:

_____
SIMONS, ACTING P.J.

_____
WISEMAN, J.*

A164056

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10